UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LEON DUGGAN,

       Plaintiff,  : 04 Civ. 3143

 -against-

                **OPINION & ORDER**

LOCAL 638, ENTERPRISE ASSOCIATION
OF STEAM, HOT WATER, HYDRAULIC
SPRINKLER, PNEUMATIC TUBE, ICE
MACHINE, AIR CONDITIONING
AND GENERAL PIPEFITTERS,

       Defendant.
------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

    Plaintiff, Leon Duggan ("Duggan") brought this action against his union, Local 638, Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Machine, Air Conditioning and General Pipefitters ("Local 638" or "the union"). Duggan alleges that Local 638 discriminated against him because of his race by failing to refer him for work assignments. Duggan claims that Local 638's conduct violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), as well as 42 U.S.C. § 1981, Section 296 of the New York Human Rights Law, Section 43 of the New York Civil Rights Law, and Section 8-107 of the New York City Administrative Code. Local 638 has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Oral argument was held before this Court on September 27, 2005. Following the argument, I ordered plaintiff to provide the Court with "a statistical analysis demonstrating as precisely as possible the hours of work performed by minority and non-minority union members from January 1, 2000 through December 31, 2004." (Order dated September 30, 2005). In compliance with that Order, plaintiff submitted additional exhibits and a supplemental memorandum of law on October 28, 2005. Defendant responded on November 4, 2005. Having reviewed the parties' supplemental submissions, for the reasons set forth below, the motion for summary judgment is GRANTED.

## I. BACKGROUND

### A. Factual Background

Duggan is an African-American male with 30 years experience as a professional welder. (Affirmation of Richard S. Brook, Esq., dated July 28, 2005 ("Brook Aff."), Ex. 22; Affidavit of Leon Duggan, dated August 10, 2005 ("Duggan Aff.") ¶ 9). Local 638 consists of construction and service steamfitters who perform work within New York City and on Long Island. (Affidavit of William R. Abbate, dated July 14, 2005 ("Abbate Aff.") ¶¶ 5-7). Duggan first applied for membership in Local 638 in May 2000, but his application was rejected. (Duggan Aff. ¶ 3). Duggan applied unsuccessfully again in October 2000. (Id. ¶ 4). Finally, after letters to Local 638 were written on Duggan's behalf by a staff attorney at the NAACP, by the Executive Director of "Fight Back," an organization dedicated to combating racism in employment, and by counsel to Mr. Duggan, Duggan was admitted into the union on January 8, 2002. (Id. ¶¶ 2, 5-7).[1]

Plaintiff asserts that Local 638 exerts considerable influence over the work assignments of its members by referring contractors to individual members and by informing members of contractors who are hiring.[2] (Id. ¶ 8). Plaintiff claims that, after joining Local 638, he "actively sought . . . referrals" for full-time work but "received virtually none." (Id. ¶ 10). Specifically, during the three year period beginning in January 2002 and ending February 1, 2005, Duggan worked a total of 997 hours. (Id. ¶ 11). Duggan earned approximately $40,000 from his union work. (Id. ¶ 12). However, Duggan contends that he was available for work 40 hours per week for 150 weeks during this period. (Id. ¶ 11).[3]

On February 24, 2003 Duggan filed a complaint against Local 638 with the United States Equal Employment Opportunities Commission ("EEOC"). (Affirmation of Sheldon Karasik, Esq., dated August 16, 2005 ("Karasik Aff."), Ex. G). On February 27, 2004 the EEOC

---

[1] In this action, Duggan does not assert a claim based on the union's previous denials of membership. (See Compl. ¶¶ 14-21).
[2] Local 638 disputes plaintiff's characterization of the method by which union members receive work assignments. The union contends that members seek and find work on their own, by word of mouth, and that the union does not operate any formal work referral system. (Abbate Aff. ¶¶ 13-15).
[3] Duggan notes that he received almost no union work in 2002, but that after filing a complaint with the EEOC on February, 24, 2003 his work assignments increased dramatically. (Duggan Aff. ¶¶13-14). During 2003 Duggan's gross pay on union projects exceeded $25,000. (Id. at 14). However, in 2004 Duggan's work assignments decreased and his total wages for union work that year were less than $7,000. (Id.)

2

terminated its investigation of Duggan's complaint and issued him a "Notice of Right to Sue." (Karasik Aff., Ex. J). Plaintiff filed the instant action on April 26, 2004.

B.     **The 1973 Injunction**

Local 638's past discriminatory practices have been the subject of litigation in this District. It is helpful to briefly review the history of that litigation. On June 21, 1973, in a consolidated action brought against Local 638 by the United States and by a class of non-white steamfitters, then District Judge Dudley Bonsal found that Local 638 had violated Title VII by, *inter alia*, discriminating against non-whites in its admission of new members, and by discriminating against non-whites in its work referral practices. See United States v. Local 638, 360 F. Supp. 979 (S.D.N.Y. 1973). In so finding, Judge Bonsal held that the union did not "maintain a formal hiring hall" and that there was "no formal method of referring workers for employment . . . . Information concerning available employment is circulated informally by word of mouth and other means." Id. at 986. Judge Bonsal also found that "there [was no] evidence that . . . Local 638 . . . engaged in purposeful discrimination" with regard to work referral. Nonetheless, the court held that common work referral practices "in combination with the history of discrimination" in admissions to the union gave "whites advantages in obtaining employment." Id. at 990. Therefore, the court ruled that the steamfitting industry's work referral practices should be "modified if past discriminatory patterns are to be corrected." Id. To remedy the situation, the court mandated that Local 638 maintain a list of available jobs and of steamfitters seeking work, and that this list be accessible to union members and to contractors. Id. at 991. The court also appointed a special Administrator to recommend the adoption of additional measures. Id.

In the ensuing litigation over the damages due individual class members as a result of Judge Bonsal's findings, the Second Circuit held that "any nonwhite steamfitter . . . who claims that he was discriminated against by work referral practices is entitled to prove the discrimination against him and any resulting damages." EEOC v. Enterprise Assoc. Steamfitters Local No. 638, 542 F.2d 579, 587 (2d Cir. 1976).

## II. APPLICABLE STANDARD

### A. Summary Judgment

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (*per curiam*); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). It is not the court's role to resolve issues of fact; rather, the court may only determine whether there are issues of fact to be tried. Donohue, 834 F.2d at 58 (citations omitted). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment, the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A discriminatory intent or animus is essential to the ultimate determination of employment discrimination claims and therefore a "trial court must be cautious about granting summary judgment." Gallo v. Prudential Residential Serv., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); *accord* Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) (holding that "in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary."). Essentially, the question on summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

### B. Title VII

Pursuant to Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin" 42 U.S.C. § 2000e-2(a)(1). The Supreme Court articulated a three-step framework for reviewing cases brought under Title VII in McDonnell Douglas Corp. v. Green. 411 U.S. 792 (1973). First, under McDonnell Douglas and its progeny, the plaintiff-employee "must establish a prima facie case of discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 567 (2d Cir. 2000). Second, if the plaintiff-employee satisfies this burden, the defendant-employer has the opportunity to "articulate a legitimate, clear, specific and non-discriminatory reason" for its adverse employment action. Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998) (internal quotation omitted). Third, where necessary and appropriate, plaintiff-employee may demonstrate that the defendant-employer's explanation was not the actual reason for the plaintiff-employee's dismissal. In other words, "the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination." Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996).

Plaintiff purports to assert a claim under a "disparate impact" theory of employment discrimination. (Compl. ¶¶ 25-26). A disparate impact claim alleges that a facially neutral employment policy disproportionately impacts a protected group. See EEOC v. Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus., 186 F.3d 110, 117 (2d Cir. 1999). To establish a *prima facie* case of disparate impact discrimination, a plaintiff must allege a specific employment practice and demonstrate that the practice has a disproportionate impact on a protected group. Id. Here, plaintiff claims that the "nepotistic and cronyistic [work] referral practices" of Local 638 have prevented him from receiving adequate work assignments. (Compl. ¶ 25). This appears to be an allegation not of a "facially neutral" employment practice, but of intentional discriminatory behavior. Thus, the gravamen of plaintiff's claim more closely resembles a "disparate treatment" theory of discrimination. To establish a *prima facie* case of disparate treatment discrimination, a plaintiff must demonstrate that "1) he belongs to a protected class; 2) he was . . . treated disparately then similarly situated non-members of his protected class; and 3) there is evidence of discriminatory intent by the defendant." Batista v. Union of Needleworkers, 97 Civ. 4247, 2000 WL 1760923, *3 n.5 (S.D.N.Y. Nov. 30, 2000) (Baer, J.) (noting that plaintiff failed to produce evidence showing discriminatory intent). As will be set forth below, plaintiff's claim is deficient under either standard.

In addition, plaintiff alleges a "retaliation" claim under Title VII. (Compl. ¶ 26). To establish a prima facie case of retaliation, plaintiff must demonstrate that "1) he was engaged in a protected activity; 2) defendant knew of plaintiff's participation in that activity; 3) an employment action adversely affected the plaintiff; and 4) a causal connection existed between the protected activity and the adverse action." Batista, 2000 WL 1760923, at * 4.

C.   **Additional Claims**

Plaintiff's claims under 42 U.S.C. § 1981, the New York Human Rights Law and the New York City Administrative Code are subject to the same analytical framework as plaintiff's Title VII claims. See Hudson v. Int'l Business Machines Corp., 620 F.2d 351, 354 (2d Cir. 1980) (Section 1981 claim subject to burden shifting analysis); Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (New York Human Rights Law and New York City Human Rights Law claims subject to same analysis as Title VII employment discrimination claim).[4] Therefore, these claims will be analyzed together with plaintiff's Title VII claims.

### III.   DISCUSSION

To establish a *prima facie* case of disparate treatment discrimination, plaintiff must demonstrate that similarly situated non minority individuals were treated differently than himself under circumstance giving rise to an inference of racial discrimination. See Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157, 161 (2d Cir. 1991) (to satisfy *prima facie* burden "a Title VII plaintiff initially must . . . offer[] evidence adequate to create an inference that an employment [action] was based on a discriminatory criterion") (internal quotation omitted). To survive summary judgment, a plaintiff "may raise . . . an inference [of discrimination] by showing that [his] employer . . . treated him less favorably than a similarly situated employee

---

[4] Plaintiff also asserts that his New York Civil Rights Law claim is governed by the same analysis as his Title VII claim. However, Dawson, the case plaintiff relies on for this proposition, does not discuss a claim predicated on the New York Civil Rights Law. See Dawson, 398 F.3d 211. Defendant does not dispute plaintiff's characterization of the substance of this claim, but defendant does argue that the New York Civil Rights Law claim is barred because plaintiff failed to serve notice upon the New York Attorney General. See New York Civil Rights Law § 41. For the purposes of this Opinion, the Court will assume that plaintiff's claim under the New York Civil Rights Law is subject to the same analysis as plaintiff's Title VII claim. Since, for reasons set forth below, defendant's motion for summary judgment is granted, this Court need not address defendant's argument regarding service of process.

6

outside his protected group." Graham v. Long Island Rail Road, 230 F.3d 34, 39 (2d Cir. 2000). Here, plaintiff has provided evidence that he received relatively little work (997 hours over the course of three years) during his time in the union. Furthermore, in an attempt to demonstrate a disparity in the treatment of minority and non-minority union members, plaintiff has provided a statistical analysis of the hours worked by those groups of employees.[5]

"A plaintiff may . . . present statistical findings as circumstantial evidence of intentional discrimination." Smith v. Xerox Corp., 196 F.3d 358, 370 (2d Cir. 1999). However, the statistical evidence must be sufficient to create an inference of discrimination. See Hollander v. American Cynamid Co., 172 F.3d 192, 202 (2d Cir. 1999). See also Hudson v. International Business Machines, 620 F.2d 351, 355 (noting that statistics alone cannot satisfy a plaintiff's *prima facie* burden in a disparate treatment case). Here, in his initial submission, plaintiff compared the weeks worked by African-American union members in 2002 to the weeks worked by a randomly selected group of non-minority union members during that same period.[6] Plaintiff found that, during 2002, only 19% of the African-American union members were assigned 40 or more weeks of work, while approximately 35% of the white union members were assigned 40 or more weeks of work during that same period.[7] Furthermore, in his supplemental submission, plaintiff compared the hours worked by all African-American union members between 2000 and early 2005 with the hours worked by a random sample of non-minority union members during that same time period. Plaintiff found that 3.5% of the African-American union members logged over 10,000 total hours of work, while 7% of non-minority union members exceeded 10,000 hours. Plaintiff also demonstrated that, during this same period, 10.5% of the African-American

---

[5] Plaintiff also attests that he "believes" that he was denied work opportunities because of his race. (See Duggan Aff. ¶¶ 10, 14, 26). However, plaintiff provides no evidence of any basis for that belief apart from his lack of work and Local 638's history of racial discrimination. While plaintiff attests that his belief is based on his "own personal observations and experiences," he provides no description of those observations and experiences. (Id. ¶ 10). In addition, plaintiff has provided an affidavit from another African-American member of Local 638, Trevor Lewis, in which Mr. Lewis attests that he has "frequently been given reason to believe that the Union is hostile to African-Americans." (Lewis Aff., dated August 6, 2005, ¶ 6). However, Mr. Lewis provides no factual assertions in support of his allegation.
[6] This analysis was performed by plaintiff's counsel, and is set forth in plaintiff's Memorandum in Opposition. (See Plaintiff's Memorandum in Opposition, dated August 16, 2005 ("Pl.'s Mem.") at 11). Plaintiff arrived at a list of African-American union members by taking defendant's list of all minority union members and removing those with Asian and Hispanic surnames. (Pl.'s Mem. at 11 n.2).
[7] Plaintiff claims that these statistics violate the EEOC's "four-fifths rule," which states that a "selection rate" for any minority group which is less than four-fifths or 80% of the selection rate for non minorities will "generally be regarded" by federal agencies as "evidence of adverse impact." 29 C.F.R. § 1607.4(D). However, "[t]his rule is not binding on courts, and is merely a 'rule of thumb' to be considered in appropriate circumstances." Joint Apprenticeship Comm., 186 F.3d at 118.

members logged less than 1,000 total hours, while only 4% of the non-minority union members logged less than 1,000 hours. Finally, plaintiff demonstrated that, between 2000 and early 2005, the average African-American union member logged 5,824 hours while the average non-minority union member logged 6,061 hours—a difference of slightly less than 4%.

Defendant has also provided a statistical comparison of the hours worked by African-American and non-minority union members.[8] Defendant has demonstrated that, between 2000 and 2004, African-American union members averaged 5,932 hours while non-minority union members averaged 5,943 hours—a difference of .19%. Defendant has broken this data down by year to show that in 2000 and 2001 African-American union members actually averaged more hours than their non-minority counterparts. Further, defendant asserts that plaintiff's comparison of union members who exceeded 10,000 hours is inapposite. First, defendant points out that plaintiff mistakenly omitted one African-American union member who did in fact exceed this benchmark. When this individual is included, 5.2% of African-Americans worked more than 10,000 hours as compared with 7% of non-minority members. Further, defendant asserts that the 10,000 hour mark is completely arbitrary. When a benchmark of 9,500 hours is utilized instead, 10.5% of African-Americans exceeded that level, as compared with 11% of non-minority union members. When a benchmark of 7,000 hours is used (35 hours per week for 40 weeks over 5 years) more African-Americans exceeded this number than non-minority members. Likewise, defendant asserts that a 1,000 cutoff is arbitrary. If 500 hours is used instead, more non-minority union members worked less than 500 hours than African-American members. Finally, defendant argues that, by plaintiff's own analysis, plaintiff himself logged drastically fewer hours (871)

---

[8] There are differences between the data sets utilized by plaintiff and defendant. Plaintiff asserts that his data set consists of all members who joined the union on or after the date that plaintiff joined. (See Karasik Aff., dated October 28, 2002, ("Karasik Aff. II") ¶ 3). Defendant claims that its data concerns all individuals who joined the union either two years before or two years after the date that plaintiff joined. (See Brook Aff. dated November 4, 2005 ("Brook Aff. II") ¶ 4). Therefore, defendant's data set includes individuals who joined the union up to and including December 31, 2003 (but not those who joined in 2004). Further, defendant's analysis includes all hours worked by union members up to December 31, 2004, while plaintiff includes hours worked "through the first few months of 2005." (Karasik Aff. II ¶ 4). Finally, plaintiff has compared the hours worked by African-American union members with the hours worked by a random sample of 114 non-minority union members. (Karasik Aff. II ¶ 4). Defendant has compared the average hours worked by all African-American union members to the average hours worked by all non-minority union members. (Brook Aff. II ¶¶ 6-15).

between 2000 and 2004 than did either the average African-American or the average non-minority union member during that same period.[9]

Plaintiff's statistical analysis does not suffice to demonstrate that plaintiff was treated differently than similarly situated non minority union members under circumstances giving rise to an inference of discrimination. See, e.g. Gulino v. Board of Educ. of the City of New York, 236 F. Supp. 2d 314, 340 (S.D.N.Y. 2002) ("In order to demonstrate the specific racial motivation in a disparate treatment case . . . plaintiffs must control for multiple variables, to eliminate the likelihood that the employment action was the result of non-discriminatory factors.") Defendant correctly asserts that plaintiff's 1,000 hour and 10,000 hour benchmarks are completely arbitrary, and that a more reasonable 7,000 hour benchmark produces a higher pass rate for African-Americans than for non-minorities. Furthermore, when average overall hours worked are compared, plaintiff's data reveals a disparity of less than 4% between African-Americans and non-minority union members, while defendant's data produces a difference of .19%. Defendant's numbers are more reliable here as well, since defendant has analyzed the average hours worked by all non-minority members, while plaintiff used only 114 randomly selected non-minority members for comparison. A difference of less than .2% does not raise an inference of disparate treatment.[10]

Plaintiff's claim fares no better under a disparate impact analysis. In disparate impact cases, "[s]tatistical data may be admitted to show a disparity in outcome between groups, but to make out a *prima facie* case the statistical disparity must be sufficiently substantial to raise an inference of causation." Smith, 196 F.3d at 365. A plaintiff must "present statistical evidence . . . sufficient to show that the [employment] practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Id. (internal quotation omitted). Here, the purported statistical disparities are not "substantial enough to raise an inference of causation." EEOC, 186 F.3d at 117.

Logic dictates that plaintiff's claim cannot proceed under a retaliation theory either. Assuming that plaintiff has shown that he engaged in a protected activity of which defendant was

---

[9] Neither plaintiff nor defendant has adjusted this data for other factors, such as skill level or level of training, that could affect the amount of work received. Both parties assert that the union does not keep information regarding such characteristics. (Karasik Aff. II ¶ 9; Brook Aff. II ¶ 5).

[10] Plaintiff's comparison of the percentage of African-American and non-minority union members who worked more than 40 weeks per year is less demonstrative than a comparison of average overall hours worked. Plaintiff has provided no reason to compare weeks rather than hours or to use 40 weeks per year as the appropriate benchmark.

aware, plaintiff has not shown that he suffered any adverse employment action. See Batista, 2000 WL 1760923, at * 4. Since plaintiff has not demonstrated that he was treated differently than other similarly situated union members, he has also not shown that his lack of work referrals constituted an adverse employment action.

Since plaintiff has failed to demonstrate that he was treated differently than similarly situated non minority union members, plaintiff has failed to meet his *prima facie* burden. Therefore, there are no triable issues of fact and defendant is entitled to summary judgment as a matter of law.[11]

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this motion and remove this case from my docket.

**IT IS SO ORDERED.**

New York, New York
November __, 2005

_____
U.S.D.J.

---

[11] Plaintiff has requested that, in the event this Court finds plaintiff has failed to carry its *prima facie* burden, plaintiff be permitted to reopen discovery. However, this Court is not inclined to give plaintiff a third bite at the apple. Furthermore, there does not appear to be any additional evidence that plaintiff could adduce that would affect the outcome of this motion.

10